UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| MICHAEL KIM, | CASE NO. C10-1850RSM |
|---|---|
| Plaintiff, | ORDER GRANTING MOTION FOR SUMMARY JUDGMENT |
| v. | |
| THE BOEING COMPANY, | |
| Defendant. | |

This matter is before the Court for consideration of defendant's motion for summary judgment, Dkt. # 15. Plaintiff has opposed the motion, and the matter has been fully briefed. The Court deems oral argument on the motion unnecessary and, for the reasons set forth below, shall grant the motion.

FACTUAL BACKGROUND

The following factual recitation is based on facts set forth in plaintiff's complaint. Plaintiff did not file a declaration stating facts in opposition to summary judgment. While he did file exhibits to support his opposition, these have not been properly authenticated and many are

inadmissible.[1] Except where indicated otherwise, the Court will deem the facts set forth in this section as undisputed for the purposes of resolving the summary judgment motion.

Plaintiff Michael Kim, who possesses a bachelor's degree in accounting, worked for defendant The Boeing Company ("Boeing") for nine years ending in the spring of 2009. During the last two and a half years, he was a Business Analyst for cost management in the "Supplier Management and Procurement" division of the Commercial Airplanes Group. His immediate supervisor was Jeffrey Okazaki, and his primary job responsibilities included consolidating cost data for the company's financial statements. Complaint, ¶¶ 8-11.

On December 20, 2006, plaintiff reported what he believed to be financial irregularities in Boeing's cost accounting, and violations of the Sarbanes-Oxley Act ("SOX")[2] standards, to the company's Ethics Office. *Id.*, ¶ 12. Boeing classified this report as "SOX Submittal # 20061220074023, and noted that plaintiff also reported that he was experiencing retaliation for raising these concerns. *Id*. The details of plaintiff's allegations, and Boeing's investigation, will be discussed further below.

---

[1] Counsel's declarations and supporting exhibits and appendices filed in opposition to summary judgment wholly fail to meet the standards set forth in Fed.R.Civ.P. 56(c)(4) and 28 U.S.C. § 1746. Plaintiff's exhibits are attached to declarations which state, in relevant part, "I, Stephani L. Ayers, am competent to testify and do hereby declare or affirm the following . . . . Respectfully submitted, Stephani L. Ayers." Dkt. ## 24, 25, 29. Nowhere does counsel state that she has personal knowledge of the matters presented therein, or certify or verify that the declaration is made under penalty of perjury.

[2] Section 404 of the Sarbanes-Oxley Act of 2002, or "SOX", 15 U.S.C. § 7262, requires publicly traded companies to assess the design and effectiveness of internal controls over financial reporting. Section 802 of SOX, 18 U.S.C. § 1519 assesses criminal penalties upon persons who alter, destroy, conceal or falsify records " with the intent to impede, obstruct, or influence" an investigation of any matter within the jurisdiction of any department or agency of the United States. Section 806 of SOX, 18 U.S.C. § 1514A(a)(1) provides protection to "whistleblowers", employees who provide information about or report conduct which the employee reasonably believes violated certain enumerated provisions of law, as set forth in detail below.

In May, 2007, plaintiff made a second report of financial irregularities to his managers, Jeff Okazaki and Arsbaha Kahssai. Complaint, ¶ 29. The item of his concern was a cash payment of $8 million made by Boeing in May of 2002 to a supplier (and equity joint venture partner), which plaintiff claims was mischaracterized as a surcharge. *Id*. He alleges that these managers assured him that there was nothing irregular about the transaction of which he complained, and it did not require investigation. *Id*.

In September, 2007, plaintiff contacted a Senior Vice President of Internal Governance to complain of the inadequacy of the investigation of his December 20, 2006 report. His complaint was assigned to an ethics manager in Arizona for further investigation. Complaint, ¶ 30.

At the completion of the third quarter forecast for 2007, plaintiff reported to his manager Jeff Okazaki that there was a substantial discrepancy between the figures produced by a new Forecast and Planning Tool ("FPT") then being implemented, and those produced by an earlier FPT. Complaint, ¶ 31. The ending balance shown using the new FPT was $870 million less than the figure produced by the former FPT, indicating to plaintiff that the older system had been overstating cost of sales. Plaintiff felt this discrepancy should be reported to the SOX Audit Committee. *Id*. According to the allegations in the complaint, Mr. Okazaki advised him that "nothing was irregular about the process and no corrective actions or analysis were warranted." *Id*.

In March, 2008, plaintiff reported his allegations of financial irregularities, and of retaliation, to his organization's director, Kevin Waggoner. Another ethics advisor, Ann Woodward, was assigned to the investigation. Complaint, ¶ 32. Also in March, 2008, plaintiff

reported details of the alleged retaliation to Human Resources (HR). Complaint, ¶ 33. He provided the same information to Ms. Woodward in June, 2008. *Id*.

With respect to retaliation, plaintiff alleges that "[w]ith each successive reporting of Boeing's financial misconduct, [his] working environment became incrementally more hostile and appeared plainly designed to discourage him from pursuing his concerns about SOX non-compliance." Complaint, ¶ 45. Specifically, in March of 2007, two of his co-workers reported to him that a senior manager had "revealed to her staff that there was a whistleblower within her group." Complaint, ¶ 46. He further alleges that his desk drawers and file cabinets were breached five times after his December 2006 report. Complaint, ¶ 47. He reported these breaches to his manager Mr. Okazaki as harassment, but nothing was done to investigate or prevent further intrusions. *Id*.

On November 14, 2007, Mr. Okazaki advised plaintiff that he wanted him to change to a different position, essentially switching job assignments with another employee, Lin Wei. Complaint, ¶ 48. Plaintiff asked if the transfer was voluntary or mandatory, and when told it was voluntary, plaintiff declined to accept. *Id*. A month later, in mid-December, 2007, Mr. Okazaki informed plaintiff that the transfer would be mandatory. *Id*.

Plaintiff began meeting with the Boeing Equal Employment Opportunity ("EEO") representative on November 26, 2007, to provide details of what he perceived as retaliatory actions. Complaint, ¶ 49. Plaintiff felt that this matter was not investigated in good faith, and that this failure to investigate was further evidence of a hostile work environment. His concerns were assigned to ethics advisor Tim O'Neal in Long Beach, California for further investigation. Complaint, ¶ 50-51.

In August, 2008, Mr. Okazaki again informed plaintiff that he must transfer, switching job duties with Lin Wei. Complaint, ¶ 52. Plaintiff alleges that Mr. Okazaki "did not clearly state that the transfer was mandated" at that time. *Id*. He contends that it was not until September 17, 2008 that he learned Mr. Okazaki considered the transfer mandatory, when he was so informed by Nicole Pearce in HR. Complaint, ¶ 53. On that day, Ms. Pearce sent plaintiff an e-mail demanding that he meet with her that morning. Complaint, ¶ 54. At that meeting, also attended by Mr. Okazaki, plaintiff was asked if he would "work toward" the transfer. Plaintiff stated he would "not support it." Complaint, ¶ 56. Ms. Pearce informed plaintiff that his response was insubordination and he was suspended immediately, and escorted from his workplace.[3] *Id*. Plaintiff went on medical leave, and was informed that he would be terminated from his position immediately when he returned to work. Complaint, ¶ 57. While on leave, and before he was terminated, plaintiff was selected for lay-off due to a reduction in force. Complaint, ¶ 58. He contends that his threatened termination and ultimate lay-off were further retaliation for his protected activity in reporting SOX violations.

Defendant has moved for summary judgment on the basis that the only alleged retaliatory actions which are not time-barred are plaintiff's suspension and termination for insubordination, and his subsequent lay-off. Defendant contends that these actions were not based on retaliation and would have occurred regardless of plaintiff's alleged protected activity. Defendant further contends that plaintiff's reports of financial irregularities did not fall within the area of activity protected under Section 806 of SOX.

---

[3] Plaintiff's recitation of the events in September, 2008 is incomplete, as shown below. The Court has set forth the facts in this paragraph as plaintiff alleged them in his complaint, but notes that many of these are in dispute.

Plaintiff has opposed the motion for summary judgment as to his termination and lay-off, but has not offered opposition to defendant's argument on the time-bar for other alleged retaliatory actions. Defendant has demonstrated that the SOX statute includes a 90-day statute of limitations for filing a complaint with the Occupation Safety and Health Administration ("OSHA"). The 90-day period begins to run when the employer communicates an adverse employment action to the employee. 29 C.F.R. § 1980.103(d). Plaintiff filed his complaint of retaliation with OSHA on December 15, 2008. Declaration of Kathie Powell, Dkt. # 19, Exhibit N, p. 2. Therefore, any alleged retaliatory actions taken prior to September 15, 2008 are time-barred. The only adverse action which fell within the statutory period was plaintiff's September 17, 2008 suspension pending his termination.

DISCUSSION

**I. Legal Standard**

Plaintiff filed this complaint pursuant to Section 806 of the Sarbanes-Oxley Act ("SOX"), 18 U.S.C. § 1514A. The Court has jurisdiction of the matter pursuant to § 1514A(b)(1)(B), as more than 180 days passed after the filing of plaintiff's complaint with OSHA before the Secretary reached a decision.

SOX's whistle-blower provision protects employees of publicly-traded companies from discrimination in the terms and conditions of their employment when they take defined actions to report conduct that the employee reasonably believes constituted certain types of fraud or securities violations. The section provides, in relevant part,

> **(a) Whistleblower protection for employees of publicly traded companies**---No [publicly traded company as defined in the statute] . . . may discharge, demote, suspend, threaten, harass, or in any other manner discriminate against an employee in the terms and conditions of employment because of any lawful act done by the employee---

(1) To provide information, cause information to be provided, or otherwise assist in an investigation regarding any conduct which the employee reasonably believes constitutes a violation of section 1341, 1343, 1344, or 1348 [of Title 18, U.S.C.], any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders, when the information or assistance is provided to or the investigation is conducted by ---
(A) A Federal regulatory or law enforcement agency;

(B) Any Member of Congress or any committee of Congress; or

(C) a person with supervisory authority over the employee (or other such person working for the employer who has the authority to investigate, discover, or terminate misconduct); . . .

18 U.S.C. § 1514A(a)(1). The referenced section, of Title 18, namely §1341, §1343, §1344, and §1348, refer, respectively, to mail fraud, wire fraud, bank fraud, and securities fraud.

Section 1514A claims are analyzed under the burden-shifting procedures set forth for whistle-blower claims brought under 49 U.S.C. § 42121(b). 18 U.S.C. § 1514A(b)(2)(A). The plaintiff must first make out a prima facie case of retaliatory discrimination by showing that (1) he engaged in protected activity or conduct; (2) his employer knew or suspected, actively or constructively, that he engaged in the protected activity; (3) he suffered an unfavorable personnel action; and (4) the circumstances were sufficient to raise an inference that the protected activity was a contributing factor in the unfavorable action. *Van Arsdale v. International Game Tech.*, 577 F. 3d 989, 996 (9th Cir. 2009); 29 C.F.R § 1980.104(b)(1)(i)-(iv). If the plaintiff meets his burden of establishing a prima facie case, the employer then "assumes the burden of demonstrating by clear and convincing evidence that it would have taken the same adverse employment action in the absence of the plaintiff's protected activity." *Id*.

**II. Analysis**

(a) <u>Prima Facie Case</u>

Defendant contends that plaintiff cannot make a prima facie case of retaliatory discrimination because he did not engage in protected activity. Motion for Summary Judgment, Dkt. # 15, p. 17-22. The Administrative Review Board of the Department of Labor ("ARB") held in 2006 that to constitute protected activity under SOX, an employee's disclosures must "definitively and specifically" relate to one of the six listed categories of fraud or securities violations set forth in § 1514A(a)(1). *Platone v. FLYi, Inc.,* 25 IER Cases 278, 287 (U.S. Dept. of Labor Sept. 29, 2006). The Ninth Circuit Court of Appeals has joined other circuits in adopting this "reasonable interpretation of the statute." *Van Asdale v. International Game Tech.*, 577 F. 3d at 997.[4]

Defendants, applying this standard, argue the financial and accounting irregularities of which plaintiff complained do not fall within the six areas of fraud enumerated at § 1514A(a)(1), and thus his reports do not constitute protected activity. Plaintiff argues, in opposition, that defendant has not addressed all of his SOX complaints enumerated in his complaint, specifically at ¶¶ 70 and 71, and therefore has conceded that these disclosures and reports fall within the area of protected activity. The Court need not resolve this dispute because, as set forth below, it has determined that even if plaintiff could establish a prima facie case, defendant has successfully demonstrated by clear and convincing evidence that it would have taken the same action toward plaintiff in the absence of any protected activity.

(b) Plaintiff's Suspension and Termination

---

[4] Plaintiff contends that the "definitive and specific" test of *Platone* has been "abrogated by ARB en banc" and thus no longer applies. Plaintiff's Opposition, Dkt. # 28, p. 28 n. 21. The Court notes that this ARB decision does not "abrogate" the Ninth Circuit rule articulated in *Van Arsdale* until the Ninth Circuit Court of Appeals so states. In light of the resolution of the matter set forth herein, however, the Court need not address this matter further, as it has not applied the "definitive and specific" standard to plaintiff's protected activity.

In the interest of expeditiously resolving this motion, the Court will assume, for the purposes of the burden-shifting analysis only, that plaintiff could set forth a prima facie case of retaliation under Section 806 of SOX. Defendant then bears the burden of demonstrating by clear and convincing evidence that plaintiff would have been suspended and terminated in the absence of his protected activity. The Court finds that defendant has done so.

Defendant has provided properly sworn declarations of Mr. Okazaki and Ms. Pearce which detail, from their personal participation, the events leading to plaintiff's suspension and scheduled termination. Declaration of Jeff Okazaki, Dkt. # 16; Declaration of Nicole Pearce, Dkt. # 17. According to Mr. Okazaki, plaintiff's manager, plaintiff informed him in mid-2007 that he was unhappy in his work group. Declaration of Jeff Okazaki, Dkt. # 16, ¶ 2. Mr. Okazaki had also heard complaints about plaintiff's work from his co-workers and from customers. *Id*., ¶¶ 4, 5. There were problems with his attendance, particularly on Fridays and Mondays. *Id*., ¶ 6. These issues led to lower performance reviews for plaintiff. *Id.,* ¶ 7. Mr. Okazaki determined that the best way to increase plaintiff's job satisfaction and performance was to switch plaintiff's "work packages" with another employee. *Id*., ¶ 8. Although the switch was first offered as an option, by mid-December of 2007 Mr. Okazaki had determined that it should be mandatory. *Id*., ¶ 9. Mr. Okazaki believed that the switch with Lin Wei would benefit plaintiff in that it would give him similar work, but with a different client. He would be able to work independently instead of as a member of a team, which had proved difficult for plaintiff. The switch would also provide cross-training for both plaintiff and Lin Wei, something which Boeing encouraged. *Id*., ¶ 10.

Plaintiff declined to make the change. On January 31, 2008, he sent an e-mail to Mr. Okazaki stating, "If the other topic is about moving my SOW [Statement of Work] to PSD, then

I already made myself [clear] that I am not interesting [sic] in this move and I wouldn't discuss this matter with you. Also you told me you would address this issue to HR, which I had no objection with it." *Id*., Exhibit B. Mr. Okazaki then did get HR involved, and was asked by that division not to pressure plaintiff to take the new assignment while the matter was investigated. Plaintiff had alleged to HR that the proposed transfer was retaliatory, an allegation which surprised Mr. Okazaki, as he was not aware at that time of plaintiff's internal ethics complaints. *Id*., ¶¶ 13-14.

In August of 2008, Mr. Okazaki received permission from HR to proceed with the job switch. He informed plaintiff, who indicated he was not happy with the change but did not at that time refuse it. *Id*., ¶ 15. Mr. Okazaki started implementing the switch, and e-mailed plaintiff and Mr. Lei regarding the transition. But plaintiff refused to discuss the matter, and then in an e-mail dated September 10, 2008 stated, "As I mentioned before, I totally disagree with this move, and I won't work for this transition." *Id*., Exhibit C. Mr. Okazaki then contacted Ms. Pearce in HR for help in resolving the situation. *Id*., ¶ 17.

Ms. Pearce sent plaintiff three separate requests by e-mail, asking him to meet with her to discuss the transition and his position on it. On September 12, 2008, she both called and e-mailed plaintiff to request a meeting, but plaintiff did not respond to either request. Declaration of Nicole Pearce, Dkt. # 17, Exhibit A. On September 15, 2008, she e-mailed plaintiff with a notice of a meeting "to discuss with you the current situation with your work statement." *Id*., Exhibit B. Plaintiff responded that "I have clearly expressed myself regarding this issue" and declined to meet. *Id*., Exhibit C. Ms. Pearce e-mailed back that

> I know that you feel that you have expressed yourself but you have not expressed yourself to me. I would really like to meet with you to understand your perspective. At this point, let me make sure I understand your position. You are choosing not to

> move forward with the current work statement that management has directed you to do.
>
> If your manager is asking you to do something and it is not illegal, against company policy or violating any safety measure, then you are required to follow management direction. In failing to do so you are putting your job in jeopardy because it could be taken as insubordination.
>
> I can only move forward with what I have been provided by management at this point and we need to have your side so that all the issues are understood.
>
> If you would like to meet with me please find a time that works best. My calendar is available to view.

Declaration of Nicole Pearce, Dkt. # 17, Exhibit C. Plaintiff did not respond to this request. *Id.*, ¶ 11.

On September 17, 2008, Mr. Okazaki went to plaintiff's workstation and asked him to come with him to meet with Ms. Pearce. Another manager, Patti Griffeth, attended as well. At the meeting, Mr. Okazaki asked plaintiff if he would accept the new work assignment, and plaintiff "flatly refused." Declaration of Jeff Okazaki, Dkt. # 16, ¶ 19. According to Ms. Pearce, plaintiff "sat back in his chair, crossed his arms, and said 'NO'". Declaration of Nicole Pearce, Dkt. # 17, ¶ 11. She advised plaintiff that he was "being given a management directive to perform the work, and that if he did not comply the matter would result in further corrective action up to and including discharge." *Id.*, ¶ 12. She then asked him again if he would do the work, and he again responded, "No." *Id.* At that point, Ms. Pearce felt that pursuant to company policy, she had no choice but to discharge plaintiff for insubordination. *Id.*, ¶ 13; Declaration of Eric Martin, Dkt. # 18, Exhibit C (copy of the "yellow card" carried by Boeing managers and HR personnel, detailing procedures to be followed in specific situations, including insubordination). Plaintiff was escorted back to his workplace to collect his belongings, and then escorted from the property. *Id.* He was suspended pending review of the discharge, and took medical leave of

absence. *Id*., ¶ 14. He would have been terminated immediately upon return from leave, but before that occurred he was laid off pursuant to a reduction in force.

In his opposition to summary judgment, plaintiff argues that he was never given a direct order to make the job change, that he was never warned that failure to comply with a direct order from his manager would result in discharge, and that he did not "commit insubordination or 'gross insubordination' under the Boeing policy for which he was charged." Plaintiff's Opposition, Dkt. # 28, p. 17. He also argues that the planned job change was itself retaliatory. Notably, plaintiff does not support his arguments with a declaration of his own. Instead, he cites to his deposition statements, as well as certain documents created in the course of investigations or the OSHA proceedings. As noted above, these documents attached to counsel's improper declaration are unauthenticated and for the most part inadmissible. The deposition excerpts are similarly attached to an incomplete and unsworn declaration. Declaration of Stephanie Ayers, Dkt. ## 26, 27. Nevertheless, for the purpose of resolving this motion, the Court will address plaintiff's arguments.

Plaintiff's contention that he never received a "direct order" to make the transition is based solely on his deposition testimony, stating that he was not given a date certain to report to Mr. Wei's job position. He also testified that had he been given such a direct order to report on a particular date, he would have complied. This is pure after-the-fact fabrication on plaintiff's part, in light of his repeated refusals, set forth above, to work toward the transition or even discuss the matter with his supervisor or Ms. Pearce. As Mr. Okazaki and Ms. Pearce both stated in their declarations, when plaintiff was asked if he would do the new work assignment, he flatly stated he would not. The question posed to him twice on September 17, 2008 was not theoretical or a question regarding a possible future act; it was a direct question as to whether he would do

the work as ordered, and he refused. Further, plaintiff had previously been advised in writing by Mr. Okazaki that he was to take certain definite steps toward the transition by September 15, 2008, so that by the fourth quarter of 2008 he would be working 30% of his time in Mr. Wei's position. Declaration of Eric Martin, Exhibit A. Thus his argument that he was never given a direct order, because there was no time frame for him to act, fails.

Plaintiff next argues that Boeing policy requires that an employee be given a warning that failure to comply with a manager's order will result in discharge, and that he was never given such warning. To support this argument, he cites only to a statement he made during the investigation of his discharge that "Nobody told me I would be discharged." Plaintiff's Opposition, Dkt. # 28, p. 18 n. 8 (citing to the summary of his contentions in the report of the investigation into his discharge, found at Exhibit B to defendant's motion). This hearsay statement from a report is not admissible evidence. Notably, plaintiff fails to make a declaration of his own stating that he was never warned, presumably because he could not do so. This failure to produce evidence is fatal to plaintiff's argument. Further, his unsupported argument that he was not warned is refuted by the written warning given him by Ms. Pearce on September 15 that he was "putting [his] job in jeopardy," as well as her statement at the September 17 meeting that "I told Mr. Kim . . that if he did not comply the matter would result in further corrective action up to and including discharge." Declaration of Nicole Pearce, Dkt. # 16, ¶¶ 10, 12 and Exhibit C. After each warning he was given an opportunity to change his position and state that he would comply with Mr. Okazaki's order, but he still refused.

Finally, plaintiff argues that he was charged only with "insubordination," not "gross insubordination," and Boeing policy prescribes discharge only for the latter. Plaintiff's Opposition, Dkt. # 28, p. 17. Plaintiff is incorrect on both counts. As evidence of the charge

against him, plaintiff again points to the Boeing investigation report summary of his discharge, found at Exhibit B to defendant's motion. The report concludes that "the respondent did refuse a direct order to perform work. As a result of this account, respondent is in violation of BPI-2616; specifically 3D insubordination." Motion for Summary Judgment, Dkt. # 15, Exhibit B, p. 6. The cited policy, Boeing's Business Process Instruction BPI-2616, includes only one type of insubordination, indicated as "Insubordination (Gross)" with a code of 3D. Insubordination is defined as "Refusing or failing to follow a management directive to act or cease to act, after being ordered to do so." Motion for Summary Judgment, Dkt. # 15, Exhibit D. The policy further states that "The employee must be given time to comply **and** warned that the failure to comply will result in discharge. Normally another company representative should witness this process." *Id*. The penalty is discharge; there is no lesser or graduated penalty. *Id*. Plaintiff's attempt to distinguish between "insubordination" and "gross insubordination" is thus unavailing.

Defendant has presented competent evidence, summarized above, that plaintiff was warned of possible discharge on September 15 and given a chance to comply; he was again warned and given another chance to comply on September 17 in the presence of two witnesses. Plaintiff has presented no evidence whatsoever to dispute these facts. Defendant has therefore presented clear and convincing evidence that it would have terminated plaintiff for insubordination regardless of whether he engaged in protected activity.

Plaintiff also argues that Mr. Okazaki's job change directive was itself retaliatory, but he offers no evidence whatsoever to support this contention. It is merely his suspicion. That suspicion is amply refuted by the Declaration of Jeff Okazaki, in which he sets forth the reasons for the proposed job switch. Declaration of Jeff Okazaki, Dkt. # 17, ¶¶ 8-11. Mr. Okazaki did not even know at that time of plaintiff's internal ethics complaints. *Id*., ¶ 13. Further, plaintiff

has nowhere demonstrated that the proposed job switch was an adverse employment action as that term is used in the context of retaliation analysis. *Van Asdale*, 577 F. 3d at 996. Defendant, on the other hand, has submitted evidence that the job change would have resulted in no change whatsoever in plaintiff's compensation, benefits, or job code. Supplemental Declaration of Nicole Pearce, found at Dkt. # 18, attachment 1. There is thus neither legal nor evidentiary basis for plaintiff's claim that the job change was itself retaliatory.

## CONCLUSION

Summary judgment should be rendered "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). An issue is "genuine" if "a reasonable jury could return a verdict for the nonmoving party" and a fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). The evidence is viewed in the light most favorable to the non-moving party. *Id*. However, "summary judgment should be granted where the nonmoving party fails to offer evidence from which a reasonable jury could return a verdict in its favor." *Triton Energy Corp. v. Square D Co.*, 68 F. 3d 1216, 1221 (9th Cir. 1995). It should also be granted where there is a "complete failure of proof concerning an essential element of the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "The mere existence of a scintilla of evidence in support of the non-moving party's position is not sufficient" to prevent summary judgment. *Triton Energy Corp.*, 68 F. 3d at 1221.

For the purposes of resolving this motion, the Court has assumed, without deciding, that plaintiff could make a prima facie case of retaliation in violation of § 806 of the Sarbanes-Oxley Act, 18 U.S.C. § 1514A, and has proceeded to the next step of the analysis. The Court has found

1 | that defendant has met the burden of demonstrating by clear and convincing evidence that it

2 | would have discharged plaintiff for his insubordination in the absence of his protected activity.

3 | Plaintiff has failed to produce any evidence to create any genuine dispute with respect to the

4 | facts surrounding his suspension and discharge.

5 |      Accordingly, defendant's motion for summary judgment is GRANTED and this action is

6 | DISMISSED. The trial date of October 31, 2011 is STRICKEN. The Clerk shall enter judgment

7 | in favor of defendant.

8 |      Dated this 23rd day of September 2011.

*[signature]*

RICARDO S. MARTINEZ
UNITED STATES DISTRICT JUDGE